Filed 11/22/13  R.G. v. M.M. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| R.G., | B243368 |
| Plaintiff and Appellant, | (Los Angeles County |
| v. | Super. Ct. No. BF037401) |
| M.M., | |
| Defendant and Respondent. | |

APPEAL from orders of the Superior Court of Los Angeles County, Randall F. Pacheco, Judge.  Dismissed in part and affirmed.

R.M., in pro. per., for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

_____

On April 17, 2012, pursuant to the Domestic Violence Prevention Act (DVPA) (Fam. Code, §§ 6200–6409), the family court entered a temporary restraining order (TRO) to protect M.M. (mother) from R.G. (father; collectively, parents) and issued an attendant child custody order (custody order) regarding L.G. (daughter).[1] On June 18, 2012, the court denied father's motion for reconsideration (Code Civ. Proc., § 1008 (section 1008)) of both orders. Father filed an appeal from the orders denying reconsideration.

Father contends the TRO and custody order are void because the family court failed to provide required notice (Fam. Code, § 3044, subd. (f) (Family Code section 3044(f)); the custody order also is void because the court failed to order mediation (*id.*, § 3170). He argues the custody order deprived him of his constitutional right to custody of his daughter. He also contends the family court erred in failing to enforce the parties' written joint custody agreement (custody agreement) because of the absence of exceptional circumstances warranting different custody arrangements. He further maintains the family court improperly refused to entertain his reconsideration motion on the merits on the basis that father had an alternative remedy in filing an order to show cause (OSC) for modification of the custody order.

We invited the parties to address whether an appeal lies from an order denying a motion for reconsideration made under subdivision (a) of section 1008; whether that order, instead, is reviewed on appeal from the underlying order; whether an appeal lies from a temporary custody order; and whether the order denying the motion for reconsideration of the TRO should be affirmed on the ground the proper motion was a motion to dissolve the TRO. We have received a response from father.

We conclude as follows: No appeal lies from an order denying reconsideration under section 1008. The ruling on such reconsideration motion is reviewed on appeal from the underlying order. The temporary custody order also is not appealable. We

---

[1] We augmented the record with a copy of these orders.

2

dismiss the appeal to the extent it purports to be from the orders denying reconsideration and the custody order.

An appeal from a TRO lies. We deem the appeal, which is timely, to be from the TRO, and on appeal we review the TRO and the order denying reconsideration of the TRO. We affirm the TRO and the order denying reconsideration because substantial evidence supports the family court's findings in support of issuance of the TRO. Substantial evidence also supports the family court's findings of no new facts or circumstances which would justify the granting of the Code of Civil Procedure section 1008 reconsideration motion. The TRO was not infirm for lack of notice under Family Code section 3044(f) or a failure to order mediation.

## BACKGROUND

On August 21, 2009, the conciliation court entered an order entitled "Conciliation Court Agreement and Stipulated Order Re Custody and Parenting Plan" in Los Angeles Superior Court case No. BF037401 (Stipulated Order re Custody and Parenting Plan).[2] The conciliation court awarded parents joint legal custody with mother's having physical custody of daughter, except father's having custody on certain designated days and times, which days and times were subject to "further order of the Court." The court also expressly ordered parents to "return to mediation in Conciliation Court on October 8, 2009 at 2:45 pm."

Subsequently, on April 17, 2012, at an OSC hearing regarding a request for a DVPA TRO and custody orders, the family court stated custody issues would be addressed if the TRO were granted. As a preliminary matter, on the TRO request the court noted "both parties have an opportunity to present evidence beyond what's in the declarations," meaning, "the declarations as part of the request for the [TRO], the answer, and the police report. And both sides have the opportunity to state who they have as witnesses, give a brief description of what the witness would be able to testify to, based on his or her own personal knowledge. And then the court will determine whether it's

---

[2] We augmented the record with a copy of this custody agreement and order.

3

necessary that the witness actually testify." After mother waived her right to cross-examine father's witness, Jim Guld, a neighbor who was present, the court announced it also would consider Guld's declaration, which was offered at the hearing.[3]

Mother, who was in propria persona, testified that on March 7, 2012, she was sitting in her car with the driver's door ajar when father, who was outside at the edge of the door, threw a crumpled up piece of paper at her and then hit mother with his right closed fist, grazing her left cheek before the punch landed on her right cheek as she turned to her left. Her right cheek throbbed and hurt. In shock, she exited the car and walked toward father, screaming at him. As she stood in front of him, he put her in a headlock with his right arm around her neck and held her head down by his belly.

Earlier, father had been in the back of the car with their daughter but talking to mother and "insisting on having the argument" with mother.

Father declined to testify regarding the TRO issues. Ronald Supancic, his attorney, argued Guld indicated he never saw father hit mother and did not see him put her in a headlock; rather, father simply was trying to calm mother. He also argued parents' argument was "probably inappropriate in front of the minor child"; it was "volatile but not violent"; and mother hit father.

The court explained that, "for the purpose of a [DVPA] restraining order, we don't need the kind of conduct that would result in a criminal prosecution. We don't need actual injuries," and under "Family Code section 6320, there is a wide range of behavior that would qualify for a restraining order, including harassing, intimidating." The court found "the incident of . . . stalking [staring through mother's window] on November 30th occurred." The court did not credit father's explanation for his presence "at the window of [mother's] house on December 24th." The court explained that "even under [father's]

---

[3] The record does not include mother's application for the TRO and custody orders, father's answer, or any of the declarations, including Guld's, in support of or opposition to such application, which were considered by the family court on April 17, 2012. The record does not reflect the family court considered the declarations that are in the record of Noe Montes, Dana Tynan, and Michelle Pullman, each dated April 11, 2012.

4

version, there's no reason to be at that window." The court concluded father's conduct in staring through the window was "stalking" and "certainly . . . harassing."

The court concluded a TRO could be issued "on the basis of stalking," which is improper, "[b]ut there is something worse that happened." "[E]ven under [father's] version of the incident at the car, [he] is sitting at the back of the car" with daughter. The court pointed out once mother said "'get out,'" "[t]hat's the end of the discussion." The court credited mother's version of the incident and inferred from the conflicting testimony father's "purpose wasn't to comfort the child"; rather, "the purpose was to use [his] physical presence in the car as a way to force the argument to continue."

As for the throwing incident, the court noted that in Father's declaration father stated he threw a wadded paper that hit mother in her upper chest, but in the police report he stated the paper hit her face, which also was mother's version. The court found although no "real injury [results] from a piece of wadded up paper, . . . what it . . . is saying [is] that I'm so angry and upset that I'm losing control, and I'm losing control in a way that means that I could hurt you. It is using physical force to make a point."

The court concluded, "In the context of the previous worrisome incidents at [mother's] window on November 30th and December 24th, just throwing the wadded up paper after insisting on being in the car to make sure the argument continues, which is my inference of what happened, that's a restraining order right there, even without the punch." In regard to the punching incident, the court found although throwing "the paper in and of itself is enough," father did strike mother with "a slap or a hit," albeit "maybe not [with] a closed fist, an actual punch."

The court stated, "[F]or the purpose of . . . [the DVPA], even [father's] version [of the incidents] is enough" for a TRO. "[T]he Legislature has made it clear that stalking, harassment, which is what occurred on November 30th and December 24th, is a basis for a restraining order. And the use of physical force as part of an argument is a basis for a restraining order. And even without my finding that by a preponderance of the evidence, . . . there was additional physical contact. But even without that finding, even flicking

5

the paper into [mother's] face, well, that's enough for a restraining order in and of itself." The court then issued the TRO.

The court next turned to the custody issues. Mother sought a different custody schedule for daughter, who was then three and a half years old and went to school five days a week. Her school attendance had been inconsistent, as noted by the school director. Mother explained this inconsistency was due to father's erratic work schedule, requiring father to travel "[s]ometimes . . . for a week or five days," and thus, when he was unavailable, mother would "scramble and find care."

The court concluded, "[A]t least until we have further proceedings on the case, it will be [mother's] prerogative to decide. Because there's a presumption once a restraining order is granted that the protected person would be the proper person for legal custody. And that will be the case." The court explained its concern "about the true sharing that was the base schedule. It simply requires too much ongoing cooperation and communication . . . where at the very least both parents agree that there was the kind of ugly incident in early March that had strangers calling the police. That's an indication . . . things are very difficult between the parents and cooperation is not something that can be taken for granted." In view of the exchanges taking place at school, the court concluded that, "despite that incident, it's still appropriate for [father] to have substantial time with [daughter], including substantial overnight time."

The court ordered, "subject to either party, if they consider it necessary, filing a regular family law [OSC], which will also result in a mediation being scheduled, . . . [mother] will have legal custody." The court further ordered father will have time with daughter for "an overnight during the week and then alternate long weekends. Not a true sharing, but still substantial time."

On April 27, 2012, father, in propria persona, filed a motion for reconsideration under section 1008 of the orders "(1) erroneously finding [father] guilty of domestic violence and (2) stripping him of all custody of . . . daughter." As evidentiary support he relied on two new witness declarations: the declarations of Andy and Melisa Lauer

(collectively, the Lauers), which were dated February 24, 2012, but referred to events on March 7, 2012.[4]

Father also relied on Guld's earlier declaration. In addition, in a new declaration, father denied assaulting mother "either on 7 March 2012 or any other time." He admitted throwing "a piece of paper she gave me back at her." He added mother admitted she had a "30%-40% timeshare," but father "in fact had custody 55-60% of the time [because of] more daytime hours [in that mother] would put [daughter] in childcare or school," and "[e]ven counting this time, [he] still had [daughter] no less than half the time."

This appeal is on a clerk's transcript and pertinent reporter's transcripts. A copy of mother's opposition is not in the record. In his reply, father submitted another declaration in which he stated that since the court's "order, I have observed . . . daughter exhibit the following new negative behaviors," which he enumerated and described. Among them, he recounted daughter "has become extremely needy and clingy"; "[s]he is now engaging in violent behavior at school"; and "[h]er general confidence and sense of safety and security has suffered greatly since the hearing in the following ways," which he enumerated and described, including the "new behavior" that "[e]very night in bed she now tells me she is scared to go to sleep because of monsters or evil witches."

Father also filed a "Supplemental Pleading" in which he requested permission to present oral evidence "if the Court would not grant this motion without it." In another declaration, father again admitted he "did fling a piece of paper at" mother. He admitted sitting in mother's car that night, explaining mother "granted" him access "by knowingly,

---

[4] Andy Lauer stated that on March 7, 2012, while looking out an upstairs window of his home, he saw parents outside mother's car arguing before mother got into the driver's seat. Father crumpled up what looked like a piece of paper and threw it at mother. Mother, enraged, then repeatedly shouted and hit father with both arms against his chest and face. Andy did not come forward before because he was unaware of the custody hearing and that the event would be in question. Melisa Lauer, his wife, stated that while looking out the living room window, she saw mother yelling hysterically at father outside her car parked across the street. Later, while looking through the front door window, Melisa saw mother yelling and hitting father "in what seemed like an out-of-control, erratic way."

intentionally and voluntarily parking in my carport, and she knew it was my carport." He further explained she asked him to leave, and after she declined to reconsider, he left. He stated he "did not know that custody was at stake at the DVPA hearing" and "was completely surprised and prejudiced by the Court failing to accord me notice under Family Code [section] 3044(f)."

On June 18, 2012, at the hearing on the motion to reconsider, mother appeared in propria persona, and father was represented by Attorney Supancic. Supancic sought to present the testimony of three rebuttal witnesses, the Lauers and Guld. He made an offer of proof "they were able to see clearly what was occurring . . . between [parents], that it occurred on the property of [father], that there was no choke-hold or strangulation [as] was alleged. There was an embracing to try to calm the situation. [Father will] testify that he embraced [mother] when she assaulted him." Also, "They would testify that [father] threw the paper into the car, but it wasn't an attempt to throw it in her face." She exited, "assaulted him, and . . . was screaming."

The family court noted it "already [had] the testimony of the three witnesses . . . through their declarations," which are "supposed to be complete," and wanted to know if father wanted them to testify about anything else. Supancic offered they would testify "they could see clearly" and asked whether the court should consider "a picture which shows the time of day and the lighting conditions." He stated Andy Lauer was present, and he asked if Lauer could "testify briefly." The court asked whether there was "anything more . . . on which witness testimony would be allowed in this [section] 1008 proceeding." Supancic responded it "will clarify the record and expand the knowledge of the court with regard to the true events that occurred on the date in question."

The court announced the TRO would be addressed prior to the custody order because if the TRO itself were set aside, "the whole thing would be set aside." The court ruled there would be no live testimony in view of the declarations of the witnesses and the absence of a request for cross-examination, explaining father "had an obligation to present available witnesses at the actual [original] hearing" and "to do the investigation necessary to be ready for a hearing," which includes "[checking to see] if there [were]

8

people who might have seen something . . . ." The court found, "There was no due diligence here" because "these people were right across the street."

The court denied the motion for reconsideration of the TRO "both on the basis that the evidence that's sought to be presented today should have and could have been presented at the hearing and on the basis that [such] evidence . . . does not really call into question the basis that was expressed for the restraining order."[5]

Before addressing the motion for reconsideration of the custody order, the court commented "it always was and it still is possible to simply file a regular family law [OSC] so you can modify the current custody orders, which, given the date that this motion to reconsider was filed, it would have been heard about now." Supancic argued, "[I]t's incumbent on the court to look at the best interests of the minor." The court stated, "[I]t's not part of this hearing to consider . . . the best interests of the child. This is a motion to reconsider the orders that were made at the restraining order hearing. And the basis for that is new facts or new law," and this was "not a full blown hearing on custody."

Supancic resumed arguing the best interests of the child, pointing out father's declaration which showed daughter "now is acting out in school, crying and clinging, won't stay in a single room in the house, [and] follows him around the house." He added, "[I]t's sad to see what's happened to this little girl as a result of this order."

The court responded, "[T]his is a motion to reconsider everything that's been presented so far[, not] evidence that could have and should have been presented at the time" of the original hearing. The court pointed out "to the extent that things are new

---

[5] The court also found the witnesses' proposed evidence was not relevant to the reasons for granting the TRO, which were based "on the stalking incidents in November and December . . . and on the conduct at the car." "[Father] insisted on staying in the car to perpetuate the argument" and by "using physical force to get [his] way." By staying in the car, father put mother "in an impossible situation where . . . she is the one who is going to use physical force by trying to drag [father] out of the car, which she would have had the right to do." The court disbelieved father "got out [as] soon as he was asked." The third reason was his "throwing the wadded up piece of paper," "[hitting mother] in the face," which was the "physical force as part of the argument."

9

here, they are truly new in that they are representations regarding how the current order has worked out which in truth, would obviously support a change in the orders." The court reiterated a regular family law OSC could be filed immediately to modify "these [custody] orders that have come up at the expedited restraining order hearing that really is focused primarily on a different issue."

On the issues of admonishment of rights and mediation, the court found in addition to the lack of an "actual admonishment of the basic rights [under Family Code section 3044(f)]," "the record does not reflect an attempt at mediation through the conciliation court [was held] before the restraining order hearing." The court, however, did not believe "either of these . . . procedural failures have in any way been detrimental to [father,]" because his counsel "would have known of and by necessary implication advised [father] of his relevant procedural rights, which are very simple." The court found "the failure to conduct . . . mediation prior to the restraining order hearing" was not prejudicial because "it's obvious that the parties' version of what should have happened at the time back in March and [on] April 17th and even now are strikingly different."

When Supancic argued father was prejudiced because he did not have "the opportunity to sit down with [mother] in a calm setting with a trained mental health professional, a court mediator who could point out ways that the two of them might be able [to use] to solve these problems and not have to tie up the courts in further litigation." The court responded, "But there was no request to continue the case . . . for lack of mediation"; rather, "everybody went forward on the merits," and added, "There will be a mediation when a regular order to show cause is filed."

The court ruled, "[T]he motion to reconsider the [orders issued at] the hearing on April 17th is denied for all the reasons I have said in regards to the restraining order and for the reasons I've stated in regards to the custody orders, even though I have noted

10

procedural[] . . . anomalies in regards to the custody aspect of the restraining order hearing[, which were not] prejudicial."**6**

## DISCUSSION

**1.** *Orders Denying Reconsideration under Section 1008 Not Appealable*

Father appeals from the orders denying reconsideration under section 1008 of the TRO and the attendant custody order.  An order denying reconsideration under section 1008 is not appealable.

"An order denying a motion for reconsideration made pursuant to subdivision (a) is not separately appealable.  However, if the order that was the subject of a motion for reconsideration is appealable, the denial of the motion for reconsideration is reviewable as part of an appeal from that order."  (§ 1008, subd. (g).)  Implicit in this constraint on review is the precondition that the underlying order is itself appealable and the appeal from the underlying order is timely.

As we discuss below, the temporary order is not appealable, but the TRO is both appealable and timely.  We therefore dismiss the appeal to the extent father purports to appeal from the orders denying reconsideration of the TRO and the custody order.  We also dismiss the appeal to the extent father seeks to appeal the temporary custody order. We review the TRO and the order denying reconsideration of the TRO on appeal.

**2.** *Temporary Custody Order Not Appealable*

A temporary custody order issued under the DVPA is not appealable.  (*Smith v. Smith* (2012) 208 Cal.App.4th 1074, 1089–1090.)  Father does not dispute this point of

---

**6** We note a conflict between the reporter's transcript and the clerk's transcript regarding the order denying father's motion for reconsideration.  Which record controls depends on the circumstances of each case.  (*People v. Smith* (1983) 33 Cal.3d 596, 599.) We conclude the reporter's transcript, which reflects the court denied reconsideration of both the restraining order and the custody order, rather than the clerk's transcript, which reflects denial of the restraining order only, is the correct record of the court's ruling.

11

law; rather, his position is the custody order is final, not temporary. We disagree and conclude Father's appeal as to the custody order must be dismissed.[7]

Initially, we point out the DVPA does not address the duration of custody or visitation orders issued in connection with a DVPA restraining order. Nor does the custody order itself reflect it is a final order.[8]

The DVPA provides, "A custody and visitation order issued in a proceeding brought pursuant to this division is subject to Part 2 (commencing with [Family Code] Section 3020) of Division 8 (custody of children)." (Fam. Code, § 6223.) "[T]he duration of any orders . . . for custody, visitation . . . shall be governed by the law relating to those specific subjects." (*Id.*, § 6345, subd. (b).)

A review of "Part 2 (commencing with [Family Code] Section 3020) of Division 8 (custody of children)" discloses only one provision which addresses the duration of a custody order and this provision concerns an ex parte temporary custody order,[9] which is

---

[7] This disposition obviates the need to address the merits of father's contentions regarding whether the custody order is void; that order deprived him of his constitutional right to custody of daughter; the family court should have enforced parents' custody agreement instead of making the custody order; and the court improperly refused to address his motion for reconsideration of the custody order on the merits.

[8] We note the earlier Stipulated Order re Custody and Parenting Plan also is not a final custody order. This order contains no indication it is a final custody order. (See *Montenegro v. Diaz* (2001) 26 Cal.4th 249, 258–259 [not "final judicial custody determination" where "[a]though these orders included detailed visitation schedules and did not provide for further hearings, they did not clearly state that they were final judgments as to custody"].)

[9] "In the absence of an agreement, understanding, or stipulation, the court may . . . enter an ex parte temporary custody order, set a hearing date within 20 days, and issue an order to show cause on the responding party. If the responding party does not appear or respond within the time set, the temporary custody order may be extended as necessary, pending the termination of the proceedings." (Fam. Code, § 3062, subd. (a).) Where "there is reason to believe . . . the responding party has possession of the minor child and seeks to avoid the jurisdiction of the court or is concealing the whereabouts of the child, . . . the ex parte order extended up to an additional 90 days." (*Id.*, § 3062, subd. (b).)

12

inapplicable to a custody order, as here, issued upon notice and a hearing arising from an OSC.

In all other situations under part 2, a custody order is not subject to a specific statutory expiration date, nor is there any provision under part 2 which specifically addresses when a particular custody order is final. As the family court noted, an OSC, which ordinarily gives rise to an evidentiary hearing, is the traditional procedure to modify a child custody order. [10] (See, e.g., *In re Marriage of Campos* (2003) 108 Cal.App.4th 839, 841, 843.) Father cites no authority establishing such a procedure is inapplicable to the custody order at issue.

Additionally, a review of the TRO and the custody order fails to support father's claim that the custody order is final rather than temporary. The custody order was issued on form "DV-140" in conjunction with the TRO, which was issued on form "DV-130."[11] April 17, 2015, is the designated date for expiration of the TRO. On form DV-130, a note reflects custody and visitation orders "*remain in effect after the restraining order ends. Custody, visitation . . . usually end when the child is 18.*" It recites "[c]hild custody and visitation are ordered on the attached Form DV-140."

Form DV-140, entitled, "Child Custody and Visitation Order," recites: Legal and child custody are ordered in favor of mother. "*Until the next court order*, visitation for [father]" was ordered for alternative weekends and on designated weekdays for specified time periods. (Italics added.) As to the duration of this order, form DV-140 recited, "If this form is attached to Form DV-130 *(Restraining Order After Hearing)*, the custody and visitation orders in this form remain in effect after the restraining orders on Form DV-130 end."

---

[10] We note our Supreme Court has recognized "a parent [may] seek[] modification of [even] a final judicial custody determination." (*In re Marriage of Brown & Yana* (2006) 37 Cal.4th 947, 956.)

[11] "Any order issued by a court to which this division applies shall be issued on forms adopted by the Judicial Council of California." (Fam. Code, § 6221, subd. (c); see also *id.*, § 6226.)

13

Based on the foregoing, we conclude the custody order therefore is temporary in nature because the order does not indicate it is a final custody order or cannot be modified, or it is in effect until daughter reaches majority, age 18.

### 3. *Appeal from TRO Proper and Timely*

Under the DVPA, a restraining order "may be issued . . . with or without notice, to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved." (Fam. Code, § 6300; see also *id.*, § 6218.)

The subject TRO is not a "TRO" in the ordinary sense because it is issued "ex parte." (See Fam. Code, §§ 6320, subd. (a), 6321, subd. (a), 6322; see also *id.*, §§ 3062, 6250.) Nonetheless, it qualifies as a temporary restraining order because it expires after a specific time period. A DVPA restraining order "shall state on its face the date of expiration of the order." (*Id.*, § 6224.) "In the discretion of the court, [such restraining order] issued after notice and a hearing under this article may have a duration of not more than five years, subject to termination or modification by further order of the court either on written stipulation filed with the court or on the motion of a party." (*Id.*, § 6345, subd. (a).) "The failure to state the expiration date on the face of the form creates an order with a duration of three years from the date of issuance." (*Id.*, § 6345, subd. (c).) The TRO expires on April 17, 2015, at midnight.

We conclude an appeal lies from a TRO issued under the DVPA because an appeal lies from the granting of an injunction. (Code Civ. Proc., § 904.1, subd. (a)(6).) "A domestic violence restraining order is a type of injunction, as it is an 'order requiring a person to refrain from a particular act.' [Citation.]" (*Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1503–1504; see also *McLellan v. McLellan* (1972) 23 Cal.App.3d 343, 357 ["A temporary restraining order is separately appealable."].)

Further, we determine the appeal from the TRO is timely. The TRO here was issued on April 17, 2012, and recited the parties were at the hearing or agreed in writing to the TRO and "[n]o other proof of service . . . needed." The notice of appeal was filed on August 16, 2012. The appeal therefore is timely because it was filed within "180 days

14

after entry of judgment" and the parties waived notice. (Cal. Rules of Court, rule 8.104(a)(1)(C) & (3); see Code Civ. Proc., § 1019.5, subd. (a).)

**4.** *Substantial Evidence Supporting TRO Findings*

Father challenges the evidence to support the family court's findings in support of the TRO. We determine substantial evidence supports the court's underlying findings of stalking, harassment, and physical force, which support its issuance of the TRO.[12]

**a.** *Applicable Legal Principles*

An order granting or denying a restraining order is subject to review for abuse of discretion. (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1495.) "'The appropriate test for abuse of discretion is whether the [family] court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the [family] court.'" (*Gonzalez v. Munoz* (2007) 156 Cal.App.4th 413, 420.) "To the extent that we are called upon to review the . . . court's factual findings, we apply a substantial evidence standard of review." (*Loeffler v. Medina*, *supra*, 174 Cal.App.4th at p. 1505.) Credibility is a matter for the family court to resolve, and "[t]he testimony of a single witness may provide sufficient evidence." (*Sabbah v. Sabbah* (2007) 151 Cal.App.4th 818, 823 (*Sabbah*).)

**b.** *Substantial Evidence of Father's Stalking, Harassing, and Physical Force*

At the original hearing, father did not testify regarding mother's request for a DVPA restraining order. In his declarations, father did not deny the November 30th or the December 24th incidents of him staring into the windows of mother's home occurred. The family court disbelieved father's explanation for his conduct and explained, "even

---

[12] As the family court correctly noted, a DVPA restraining order may issue upon a proper showing of stalking or harassment. (Fam. Code, § 6320, subd. (a).) Because substantial evidence supports the court's findings of stalking, harassment, and physical force, we need not and do not address whether the court had additional reasons for issuance of that order. (*J.B. Aguerre, Inc. v. American Guarantee & Liability Ins. Co.* (1997) 59 Cal.App.4th 6, 15–16 [review ruling, not reasoning, and thus "[a] trial court's order is affirmed if correct on any theory"].)

15

under [father's] version, there's no reason to be at that window." In his declarations, father conceded he was inside mother's car and mother asked him to get out. The court did not credit his claim that he left immediately. Finally, father also conceded in his declarations that he threw a wadded piece of paper at mother, striking her. Accordingly, substantial evidence supports the court's findings that father's conduct in staring into mother's window on two separate dates and his conduct in the car constituted "stalking" and "certainly . . . harassing" mother and that his throwing and hitting mother with a wadded piece of paper was the use of physical force.

## 5. *Substantial Evidence Supporting No New Facts or Circumstances Findings*

Father contends the family court erred in finding his motion for reconsideration was not supported by new facts or circumstances. Substantial evidence supports the court's findings in this regard.[13]

"Section 1008, subdivision (a) requires that a motion for reconsideration be based on new or different facts, circumstances, or law. A party seeking reconsideration also must provide a satisfactory explanation for the failure to produce the evidence at an earlier time. [Citation.]" (*New York Times Co. v. Superior Court* (2005) 135 Cal.App.4th 206, 212.) "The burden under section 1008 [requires that] the moving party could not, with reasonable diligence, have discovered or produced it at the trial. [Citation.]" (*Id*., at pp. 212–213.) "A trial court's ruling on a motion for reconsideration is reviewed [for] abuse of discretion." (*Id*., at p. 212.)

The record contains substantial evidence supporting the family court's findings that the "new" evidence, namely, the declarations of Guld and the Lauers, could have been obtained and presented at the original hearing in the exercise of due diligence or already had been considered by the court at that hearing. At the original hearing, father agreed to submit on the declaration of Guld instead of waiting until his arrival. Also, the family court considered that declaration at that hearing. At the reconsideration hearing,

---

[13] Because we find the trial court properly denied reconsideration based on these reasons, we need not address whether the motion should have been to dissolve the TRO.

Father also offered the declarations of the Lauers and requested the court allow Andy Lauer, who was present at the reconsideration motion hearing, to testify. When the court asked why the evidence of the Lauers had not been presented, father's attorney replied, "At the original hearing they were not here." He also stated father did not "know that they had seen this situation." The court pointed out it was father's obligation to investigate to determine whether any witnesses existed and in the exercise of due diligence their evidence could have been presented at the original hearing. Neither counsel nor father disputed these findings. The court therefore did not err in denying the motion for reconsideration under section 1008.

**6. *Absence of Family Code Section 3044(f) Notice Not Render TRO Void***

Father contends the TRO is void because the family court failed to provide him with the notice required under Family Code section 3044(f). We disagree.

Family Code section 3044, subdivision (a) "creates a rebuttable presumption affecting domestic violence perpetrators who seek custody of children: 'Upon a finding by the court that a party seeking custody of a child has perpetrated domestic violence against the other party seeking custody of the child . . . within the previous five years, there is a rebuttable presumption that an award of . . . custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child . . . .'" (*Sabbah*, *supra*, 151 Cal.App.4th at p. 823.)

Family Code section 3044(f) "mandates that parties be informed of the presumption, providing: 'In any custody or restraining order proceeding in which a party has alleged that the other party has perpetrated domestic violence in accordance with the terms of this section, the court shall inform the parties of the existence of this section and shall give them a copy of this section *prior to any custody mediation in the case*.'" (*Sabbah*, *supra*, 151 Cal.App.4th at p. 824, italics added.)

In enacting Family Code section 3044, it was "the Legislature's intent to ensure that parties *in custody mediations* be informed about and provided a copy of section 3044. Thus, section 3044(f) requires a court in 'any custody or restraining order proceeding' involving domestic violence accusations to provide the statutory notice to the

17

parties *before* they enter into custody mediation." (*Sabbah*, *supra*, 151 Cal.App.4th at p. 825, italics added.)

The court in *Sabbah* stated, "Family Code section 3170 mandates such mediation only where 'it appears on the face of a petition, application, or other pleading to obtain or modify a temporary or permanent custody or visitation order that custody, visitation, or both are contested.'" (*Sabbah*, *supra*, 151 Cal.App.4th at pp. 825–826.) The court concluded "section 3044(f) notice was not required at the time of the hearing on the protective order" because the father "did not contest custody and there is no record of any custody mediation." (*Sabbah*, at p. 826.)

We note that under the circumstances here, mediation would not be conducted by a traditional family court. Rather, "[d]omestic violence cases shall be handled by Family Court Services in accordance with a separate written protocol approved by the Judicial Council." (Fam. Code, § 3170, subd. (b).)

Family Code section 3044(f) does not define or otherwise describe what is meant by the term "custody mediation" and does not address whether "custody mediation" also embraces mediation conducted by a conciliation court. "The 'Family Conciliation Court Law' in Family Code section 1800 et seq. does the following: establishes jurisdiction in the '"family conciliation court"' (Fam. Code, § 1810); requires the assignment of a judge to conciliation court (Fam. Code, § 1811); permits the transfer of conciliation court matters to other judges (Fam. Code, § 1812, subd. (b)); permits a judge to receive reports and recommendations, direct the holding of hearings, authorize the conducting of an investigation, and *order mediation by the supervising and associate counselors of the conciliation court (Fam. Code, §§ 1814–1815) . . . .*" (*Hogoboom v. Superior Court* (1996) 51 Cal.App.4th 653, 667–668, italics added.) "'[A]s a practical matter, the failure to set the dispute for mediation in the conciliation court is a bar to a hearing on all custody or visitation disputes. [Citations.]' [Citations.]" (*Hoversten v. Superior Court* (1999) 74 Cal.App.4th 636, 643.)

The family court found "the record does not reflect an attempt at mediation through the conciliation court [was held] before the restraining hearing." The record

18

before us, however, contains indicia the Stipulated Order re Custody and Parenting, which was entered on August 21, 2009, long before the April 17, 2012 TRO, was achieved through mediation between parents and the conciliation court. This inference is supported by the recital on that stipulated order that parents were ordered to "return to mediation in Conciliation Court on October 8, 2009." The record does not reflect whether mediation is still on-going in the conciliation court.

We first conclude that "custody mediation" within the meaning of Family Code section 3044(f) includes mediation conducted through the conciliation court. We further conclude the family court was not remiss in failing, "*prior to* any custody mediation in the case," to advise father of "the existence" of section 3044 and to provide him with "a copy of this section." (See *id.*, § 3044(f), italics added.) The mediation before the conciliation court had already been conducted, albeit not concluded, at the time the Stipulated Order re Custody and Parenting Plan had been issued on August 21, 2009. Family Code section 3044(f) therefore did not apply and give rise to the need for compliance with its notice requirements as a precondition to the family court holding the hearing on April 17, 2012, that resulted in the issuance of the TRO and custody order at issue.

## DISPOSITION

The purported appeals from the orders denying reconsideration under Code of Civil Procedure section 1008 of the temporary restraining order and the temporary custody order are dismissed.  The appeal from the temporary custody order is dismissed. The temporary restraining order and the order denying reconsideration under section 1008 of the temporary restraining order are affirmed.  M.M. shall recover costs on appeal, if any.

NOT TO BE PUBLISHED.


                                        MALLANO, P. J.

We concur:


    CHANEY, J.


    JOHNSON, J.